**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 16-161 |
| | ) | Judge Nora Barry Fischer |
| SCOTT BOWRA, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

I.     INTRODUCTION

This matter is before the Court on a motion to suppress evidence filed by Defendant Scott

Bowra, ("Defendant"), the Government's opposition thereto, and Defendant's reply.  (Docket Nos.

120, 121, 184, 200).  The Court held a hearing on December 11, 2017.  (*See* Docket No. 222).  The

Court ordered the parties to file proposed findings of fact and conclusions of law by January 30,

2018, with responses to be filed by February 13, 2018.  (Docket No. 223).  Following an extension,

the parties filed their respective proposed findings of fact and conclusions of law on February 2,

2018.  (Docket Nos. 236, 239, 240).  The parties did not file any responses.  After careful

consideration of all of the parties' submissions, and for the following reasons, Defendant's motion

to suppress, (Docket No. 120), is denied.

II.     BACKGROUND

*A.  Facts[1]*

Defendant seeks to suppress physical evidence obtained as a result of what he contends

was an unreasonable search and/or seizure in violation of the Fourth Amendment to the United

States Constitution.  (Docket Nos. 120, 121).  To this end, Defendant has provided a police report,

---

[1] The Court has not corrected typographical and/or grammatical errors contained within the documentary evidence.
The documents discussed below were attached to Defendant's briefing and were not offered as exhibits at the hearing
in this matter.  (*See* Docket Nos. 120, 201).

dated July 21, 2016, that was prepared by Sergeant Spangler of the Butler City Police Department.

Sergeant Spangler's report provides:

> Officer was dispatched to the area of 325 West Jefferson St., in the City of Butler for a report of two individuals in a Chevy Impala possibly doing a drug transaction. Officer located a white Chevy Impala parked along 325 West Jefferson bearing PA registration #KCZ7133, which had two occupants. Officer spoke to the passenger, who identified himself as Jeffery Bowra and provided a date of birth of 4/16/76. Individual stated that he had no identification and kept grabbing the door latch, looking into the distance as though he was considering taking off. Also currency was observed along the passenger seat ($1). Name and Date of Birth provided was ran and a warrant was found for a Scott Bowra with the same date of birth. Bowra was asked to exit the vehicle and did so, at which point a crackpipe was viewed on the passenger seat, where he was seated. Bowra was detained at that point and a large sum of US currency was found in his right cargo pocket ($977.00). The female seated in the drivers seat, with the keys in the ignition was identified as [redaction]. While other Officers were speaking to her she dropped a cell phone battery from her phone, when the door was opened. Also observed behind the drivers seat was a backpack with a large amount of US Currency visible in plain sight. K9Officer, Sgt. Grooms utilized his dog and indicated that "Gunner" did alert for the presence of Narcotics coming from the vehicle. Bowra was positively identified by a relative as Scott Bowra and the warrant was confirmed by PA State Parol. Bowra was placed in County Prison.
>
> Officer applied for and was granted a search warrant for the vehicle. This officer and Sgt. Grooms searched the vehicle and recovered the following.
> -crack pipe on passenger seat and $1
> -back pack containing 509 bags of Heroin stamped "Ferrari" (Heroin was packaged in rice), 4 bags of crack cocaine totaling 56.9 grams and $6280 in US Currency along with a wallet with identification belonging to Scott Bowra.
> -4 cell phones
>
> Contraband entered into evidence and drugs packages for submission to lab.
>
> Vehicle towed by Fisher's to Fire Station. Warrant was obtained by DMJ Haggerty and vehicle searched around 0215 with Sgt. Grooms. Both Bowra and Claypool placed in BCP to be arraigned. Parole warrant confirmed and detainer faxed to BCP. SW return prepared and in bin to be returned to 50-3-05.

(Docket No. 120-2 at 4).

The application for a search warrant was submitted by Sergeant Spangler on July 21, 2016.

(Docket No. 201-2 at 1). In the application, Sergeant Spangler stated, "White Chevy sedan bearing

PA registration #KCZ7133, VIN-ZG1WF55E739212925, currently located in the Butler Bureau Fire Department. And any and all belongings inside the vehicle. Vehicle's registered owner is Jeffrey Robert Lowry who resides at [redacted]. Vehicle was in control of [redacted], and occupied by Scott Isaac Bowra." (*Id.*). Magisterial District Judge Sue Haggerty executed the application on July 21, 2016, and ordered that the warrant "shall be served as soon as practicable and may be served at any time during the day or night but in no event later than: 2:15 a.m. o'clock [on] 7-23-16." (*Id.*). In the affidavit of probable cause, Sergeant Spangler stated:

> On 7/21/2016 Officers were dispatched to the area of 325 West Jefferson St., in The City of Butler for a report of two individuals in a Chevy Impala, that look as though they are doing a drug transaction. Upon arrival Officer pulled behind a white Chevy Impala bearing PA #KCZ7133, parked alongside 325 West Jefferson St. Officer then spoke to the passenger, who identified himself as Jeffrey Bowra and provided a date of birth of 4/16/1976. Bowra was nervous and kept his hand on the door handle, as though he was preparing to flee the vehicle. He was told several times to relax and stay in the vehicle. Bowra was checked through PennDot and a warrant was found for Scott Bowra with the same date of birth. Bowra states that he had no identification on him, at which point he was asked to exit the vehicle. Upon doing so a crack pipe was viewed on the seat he was in. Bowra was detained and patted down, and a large amount of US currency was found in his right cargo pocket. Corabeth Claypool, was identified as the female seated in the drivers seat with the keys in the ignition. She dropped a battery from her cell phone onto the street upon opening the door. Claypool was detained as K-9 handler, Sgt Groom's utilized his dog and reported that "gunner" did alert to the presence of narcotics in the vehicle. While speaking to Claypool a backpack was viewed behind the drivers seat and was partially open and a large amount of US currency could be viewed. Bowra's relative exited the apartment complex and stated that Bowra's first name, was in fact Scott. Warrant was confirmed on Bowra and a criminal history was conducted and he was found to have been charged at least 5 times in the past for Violations of the PA CSDDCA. Based on this Officers experience and training, Drug Dealers are known to have large amount of US currency on them. Along with the paraphernalia being found in the vehicle, the passengers criminal history and the alert on the vehicle for narcotics from a trained Police K9, this Officer requests a Search Warrant be granted for the vehicle.

(*Id.* at 2). In the "items to be searched and seized" portion of the application, Sergeant Spangler stated:

Attachment "A" 1. Cocaine, and any form thereof, and any other illegal or illegally possessed Controlled Substance, and drug paraphernalia including but not limited to scales, baggies for packaging, pipes/bongs for smoking and any other devices that may be used to store, ingest, or distribute Cocaine and/or any other illegal or illegally possessed Controlled Substances. 2. Books, records, receipts, notes, ledgers, and/or other papers relating to the transportation, ordering, purchasing and distribution of Controlled Substances, in particular Cocaine, a Schedule II Controlled Substance. 3. Books, records, receipts, bank statements and records, money drafts, letters of credit, money order and/or cashier's checks, and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money. 4. Financial proceeds of the dealing in Cocaine and any other illegal or illegally possessed Controlled Substance(s), including but not limited to United States Currency, financial instruments, precious metals, jewelry and evidence of financial transactions relating to obtaining, transferring, secreting, or the spending of large sums of money made from engaging in illegal drug/narcotic trafficking activities. 5. Photographs, in particular, photographs of (Occupants), and others associated in the trafficking of Cocaine and/or other illegal or illegally possessed Controlled Substance(s), and of assets, and of Controlled substances, in particular Cocaine, and of Drug/narcotic paraphernalia associated with same. 6. Indicia of occupancy, residency, rental, usage and/or ownership of the premises described above, as well as the rental usage and/or ownership of any vehicle actively engaged in the trafficking of Controlled Substances, including but not limited to, rental agreements, titles, telephone bills, utility bills, vehicle registrations, canceled envelopes, safety deposit box keys, safe keys as well as keys to the actual residence and/or premises and/or vehicles. 7. Records of telephone numbers, address books, or papers which reflect names, addresses and or telephone numbers of associates and co-conspirators involved directly and indirectly in the trafficking of Controlled Substances and/or associates who have a monetary consideration /or interest in the illegal trafficking of Controlled Substances. 8. Any and all firearms utilized in the furtherance of the illegal acquisition, possession, sale, trade, distribution, storing, secreting, transfer, transportation, and/or trafficking of Cocaine, and any other illegal or illegally possessed Controlled Substance(s). Any and all firearms rebuttably presumed to be used or intended for use to facilitate a violation of the Controlled Substance, Drug Device and Cosmetic Act, Act 64.

(*Id.* at 3). On July 21, 2016, Sergeant Spangler completed a receipt/inventory of seized property. (*Id.* at 4-5). He stated that the search occurred on July 21, 2016, at 02:15 a.m. (*Id.* at 5). He notated that the following items were seized during the search: (1) 509 bags of heroin; (2) 56.9 grams of crack cocaine; (3) four cell phones; (4) $5,303.00 in United States currency; (5) a backpack containing a wallet belonging to Bowra; and (6) a crack pipe. (*Id.*).

In his Use of Canine Report, Lieutenant Grooms stated:[2]

> On 7-20-2016 at 2358 hours Sgt. Spangler and I responded to a complaint of possible drug activity in the 300 block of W. Jefferson st involving people in a white Impala. Sgt. Spangler arrived shortly before me, and was speaking with the passenger (Bowra) while I spoke with the driver Corabeth Claypool. I had noticed that Bowra kept opening the car door up, and appeared to be nervous. I then removed my K-9 Gunner from the patrol car and stood by the passenger side of the vehicle. Sgt. Spangler then removed Bowra from the vehicle and took him into custody on a outstanding warrant. At this time a crack pipe could be seen on the front passenger seat where Bowra had been sitting. At this time Claypoole was detained also. The vehicle involved was a white Chevy Impala Pa registration KCZ7133 it was parked along the South curb of W. Jefferson st, and at this time the doors were shut. I then had Gunner conduct an exterior sniff of the vehicle, starting at the drivers side rear corner and worked counter clockwise around the vehicle. As Gunner got to the front seam of the passenger side front door he altered with a head snap, increased ventilations, and after a few seconds gave a final response by sitting. Sgt. Spangler was later granted a search warrant for the vehicle, and during the search he recovered 509 stamp bags of heroin, over 50 grams of crack cocaine, and just over $5000.00 in cash. All of the items were recovered from a back pack that was behind the drivers seat.

(Docket No. 201-3 at 1).

## B. Motion Hearing

The Court held a motion hearing on December 11, 2017, at which time the parties presented evidence and oral argument. (Docket Nos. 222, 230). "[A]t a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *See United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) (internal citations and quotations omitted). "The Court judges credibility by considering a number of factors, including the witness's demeanor and manner on the stand, his ability to accurately recollect the matters at hand, the manner in which he may be affected by the outcome, the extent to which his testimony is either supported or contradicted by other evidence and

---

[2] Although he was a sergeant in July 2016, Lieutenant Grooms has since been promoted as a lieutenant. (Docket No. 230 at 73). Accordingly, the Court will refer to him as a lieutenant.

testimony in the case, and whether it withstands the 'common sense test.'" *United States v. Davis*, No. 13-CR-68, 2014 U.S. Dist. LEXIS 48843, at *9-10 (W.D. Pa. Apr. 9, 2014) (quoting *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005)); *United States v. Demings*, 787 F. Supp. 2d 320, 326 (D.N.J. 2011) (citing same). "[A] witness should not be considered any more or less credible because the witness is a law enforcement officer." *United States v. Graham*, No. 13-CR-626, 2014 U.S. Dist. LEXIS 94043, at *12 (D.N.J. July 9, 2014) (citing *United States. v. Bethancourt*, 65 F.3d 1074, 1080 (3d Cir.1995)).

Overall, the Court finds that Sergeant Spangler and Lieutenant Grooms were credible and that their credibility, in part, was underscored by the testimony of Mary Hutchison, who described the scenario in a similar fashion to the officers. The Court makes the following findings as to the evidence that was presented.

### 1. Defendant's Testimony

After the Court explained that Defendant bears the burden of proof with respect to the issue of standing, defense counsel called Defendant to address same. (Docket No. 230 at 10-11); *see also United States v. Stearn*, 597 F.3d 540, 551 (3d Cir. 2010) ("[T]he proponent of a motion to suppress bears the burden of proving not only that the search . . . was illegal, but also that he had a legitimate expectation of privacy in [the place searched].") (internal quotations omitted) (second set of brackets in original); *United States v. King*, 364 F. App'x 781, 786 (3d Cir. 2010) ("To establish standing, the party contesting the legality of the search bears the threshold burden of establishing that he or she had a reasonable expectation of privacy in the property searched and the item seized."). On direct examination, Defendant testified that some of his personal items, namely, a backpack and clothes, were located behind the driver's seat on the floor of the vehicle. (Docket No. 230 at 12). On cross examination, Defendant stated that the backpack was black and

that it had two pockets. (*Id.* at 13). Defendant had owned the backpack for approximately six months. (*Id.*).

### 2. Sergeant Spangler's Testimony

The Court then proceeded to the issue of seizure, at which time the Government called Sergeant Spangler as its first witness. (*Id.* at 13-14). Sergeant Spangler has been a police officer with the Butler City Police Department for twenty years. (*Id.* at 14-15). He has been employed as a sergeant for the department since 2012, and he is also employed as a detective for the Butler County Drug Task Force. (*Id.*). As to his training, Sergeant Spangler attended municipal police academy, was a member of the Air Force security force for over twelve years, attended numerous patrol interdiction classes, and has had in-service training and on-the-job training. (*Id.* at 15). He currently works two weeks of daylight and two weeks of midnights, with daylight shifts from 8:00 a.m. until 8:00 p.m. and midnight shifts from 8:00 p.m. until 8:00 a.m. (*Id.* at 16). For policing purposes, the city of Butler has four zones. (*Id.* at 16-17). During their shifts, officers respond to calls both inside and outside their assigned zones. (*Id.* at 17).

In discussing July 20, 2016, Sergeant Spangler stated that he was working from 8:00 p.m. on July 20th until 8:00 a.m. on July 21st. (*Id.* at 17-18). Just before midnight, Sergeant Spangler received a dispatch report that two individuals in a white vehicle parked on West Jefferson Street appeared to be completing a drug transaction. (*Id.* at 18). Every officer in a patrol vehicle with a radio turned on is able to hear the dispatches made through Butler County Communications, which is the control center. (*Id.* at 18-19). Sergeant Spangler testified that the address given for the dispatch was 325 West Jefferson Street. (*Id.* at 19). He was familiar with the address, which was a larger apartment building in the city, because he has reported there for numerous calls over the years. (*Id.*). In describing the "numerous calls," Sergeant Spangler explained that the

neighborhood is "a high drug area" and that the department has made multiple arrests for domestic disputes and drug calls at the apartment building.  (*Id.*).  After Sergeant Spangler was presented with a map of the city of Butler showing West Jefferson Street and with a satellite view of the street, he circled the area of 325 West Jefferson Street.  (*Id.* at 20-24; *see also* Docket Nos. 222-2, 222-3, 222-4, 222-5).  Reviewing another image of 325 West Jefferson Street from Google, Sergeant Spangler pointed out that the street on the left side of the building was West Jefferson Street and that the street on the right side of the building was South Chestnut Street.  (Docket No. 230 at 25-26; *see also* Docket No. 222-6).  Sergeant Spangler described West Jefferson Street as a one-way street with two lanes of traffic that travel westbound and with parking lanes on both sides of the travel lanes.  (Docket No. 230 at 26).

In discussing his response to the subject call, Sergeant Spangler testified that he traveled to the area in a marked police unit, located a vehicle fitting the description, pulled in the south travel lane just behind the car, and activated his rear lights.  (*Id.* at 27-28).  He then observed two individuals in a white Chevy, possibly completing a drug transaction.  (*Id.* at 27).  He confirmed that he was not parked in the parking lane but was parked in the southbound lane of traffic.  (*Id.* at 28).  After noting that rear lights allow motorists coming from behind to identify police vehicles, Sergeant Spangler stated that he activated his rear lights for safety purposes because he was parked in the travel lane.  (*Id.* at 29-30).  He could not recall whether the license plate for the vehicle was called in immediately but stated that he or another officer ran the plate through control, wherein an officer calls in a registration number, or through MDT, wherein an officer uses a laptop inside the vehicle.  (*Id.* at 30-31).

After pulling behind the vehicle, Sergeant Spangler approached the passenger side of the vehicle because he had observed the passenger making furtive movements.  (*Id.* at 31-32).

Although he had a firearm on his person, Sergeant Spangler did not draw it at any point during the encounter. (*Id.* at 31). Upon approaching the vehicle, he did not recognize Defendant but did recognize the driver, Corabeth Claypool, through his past interactions with her, including an incident wherein she had empty bags of heroin and syringes on her person. (*Id.* at 32-33). When Sergeant Spangler asked the passenger for identification, he stated that he did not have any but responded that his name was Jeffrey Bowra and that his date of birth was April 16, 1976. (*Id.* at 33). Sergeant Spangler ran the information through the county dispatch on his two-way radio. (*Id.* at 34). Although there was no record in Pennsylvania for that name and date of birth, the county dispatch located a wanted person with the same last name and date of birth. (*Id.*). The wanted individual's first name was Scott rather than Jeffrey. (*Id.*). Sergeant Spangler explained that a "wanted" individual has a warrant for his or her arrest. (*Id.* at 35). While waiting a few minutes for the county dispatch to respond, Sergeant Spangler observed Defendant staring off in the distance, grabbing at the door handle, and appearing like he wanted to flee the scene. (*Id.*). Before learning about the warrant, Sergeant Spangler told Defendant to wait in the car. (*Id.* at 35-36). After learning about the warrant, Sergeant Spangler asked him to exit the vehicle, and he complied. (*Id.* at 36). As Defendant exited, Sergeant Spangler saw a crack pipe on the seat. (*Id.*). He knew the item was a crack pipe through his training and experience, as he has encountered thousands in the course of his career as a police officer. (*Id.*).

After Defendant exited the vehicle, Sergeant Spangler patted him down and located a large sum of money in his right cargo pocket. (*Id.*). At this point, Lieutenant Grooms, who had his dog out of his vehicle, recognized Defendant from another incident. (*Id.* at 36-37). Sergeant Spangler stated that he later spoke with Defendant's relative, who called him by his name. (*Id.* at 37). He identified the person whom he arrested as Defendant, who was seated in the courtroom next to

defense counsel. (*Id.*). Sergeant Spangler testified that after he placed Defendant in the back of his marked police vehicle, Lieutenant Grooms motioned him to look behind the driver's seat. (*Id.* at 37-38). Sergeant Spangler then observed a backpack on the floor behind the driver's seat that was partially open and contained a large sum of United States currency. (*Id.* at 38). After he was shown a photograph, Sergeant Spangler identified same as his view of the backpack's presence in the vehicle that night. (*Id.* at 38-39; *see also* Docket No. 222-7).

Sergeant Spangler said that he obtained a search warrant for the vehicle after Defendant was arrested. (Docket No. 230 at 39). In executing the search warrant, he seized the crack pipe that was in plain view on the front seat; the backpack, which contained $5,303.00 in United States currency, 509 bags of heroin that were stamped "Ferrari," and a wallet containing Defendant's identification card; four cell phones; and approximately 56.9 grams of crack cocaine. (*Id.*).

When questioned with respect to what caused dispatch to send police to 325 West Jefferson Street, Sergeant Spangler remarked that dispatch likely received a 911 call. (*Id.* at 39-40). He had never heard the 911 call, which the Government played in the Courtroom, Defendant having no objection. (*Id.* at 40). Sergeant Spangler identified the woman who answered the call as the likely "call taker" who generally types a narrative which in turn is sent to the dispatcher. (*Id.* at 40-41). He also noted that the call taker is sometimes the dispatcher. (*Id.* at 41). The Government then played the dispatch call in this case, which Sergeant Spangler had previously heard. (*Id.* at 41-42).[3] An individual's voice in the dispatch call identified himself as "1422 Butler control," who Sergeant Spangler testified is Officer Forsythe because his call number is 1422. (Docket No. 230 at 42). Sergeant Spangler stated that the dispatcher likely called out to Officer Forsythe because he was assigned to the zone where 325 West Jefferson Street was located that night. (*Id.* at 42-

---

[3] Government Exhibit 5 is a CD that includes audio recordings of the 911 call, the dispatch call, a .wav file of Butler County 911 confirming that the CD is what it purports to be, and a video. (*Id.*; *see also* Docket No. 222-1).

43). While listening to the dispatch call, Sergeant Spangler advised that the zone car 1422 was dispatched to a drug transaction in progress at 325 West Jefferson Street and that Officer Forsythe was confirming with the dispatcher on which side of the building the vehicle was located.[4] (*Id.* at 43-44). He then noted that Officer Forsythe called out the registration, or the license plate number, of the vehicle to obtain information about the registered owner. (*Id.* at 44). Sergeant Spangler opined that Officer Forsythe requested the information after he, Sergeant Spangler, was unable to identify Jeff Bowra. (*Id.* at 44-45). When the dispatcher had no record for Jeff Bowra but had "a hit" for Scott Bowra, Sergeant Spangler testified that the name and date of birth provided for Jeff Bowra was likely false and that Scott Bowra was wanted. (*Id.* at 45). The dispatcher provided Sergeant Spangler with physical descriptor information as to Scott Bowra. (*Id.* at 45-46). Sergeant Spangler then notified control that two individuals were detained. (*Id.* at 46). He also called for a tow truck when he impounded the vehicle and asked control to confirm the warrant for Defendant. (*Id.* at 47). Sergeant Spangler arrested Defendant upon receiving confirmation of the warrant. (*Id.*).

After the audio recording of the dispatch call concluded, the Government presented video footage of the encounter, Defendant having no objection. (*Id.* at 47; *see also* Docket No. 222-1). Sergeant Spangler explained that the video footage, which he had previously viewed, originated from one of the City of Butler Police Department's street cameras that was located on the northwest corner of Jefferson and Chestnut Streets. (Docket No. 230 at 47). He testified that the street on which two cars were parked was West Jefferson Street. (*Id.* at 48). He also stated that the timer included on the video, which read 23:50:29, was 11:50:29 p.m. on July 20, 2016, and that the timer was in real-time. (*Id.* at 48-49). While viewing the video, Sergeant Spangler affirmed that the

---

[4] Throughout his testimony, Sergeant Spangler explained that the audio recording does not reflect real-time as events unfolded but, rather, only captures transmissions and not dead time. (*Id.* at 43, 46).

vehicle involved in his encounter was parked on West Jefferson Street in the south parking lane after 11:51 p.m. (*Id.* at 49). Just after midnight, Sergeant Spangler's patrol unit pulled up near the white car. (*Id.* at 50). Sergeant Spangler believes that his rear flashers were activated at that point. (*Id.* at 50-51). He reiterated that he parked in the southern travel lane of West Jefferson Street. (*Id.* at 51). As the video continued to play, Sergeant Spangler recognized himself speaking to the passenger, while Lieutenant Grooms and Officer Forsythe were standing on the driver's side of the vehicle. (*Id.*). After the Government stopped the video, Sergeant Spangler advised that Defendant did not make any statements to him about any items in the vehicle that may have belonged to him and that he did not ask him to retrieve anything from the vehicle after he was placed under arrest. (*Id.* at 51-52).

On cross examination, Sergeant Spangler confirmed that he and the other responding officers did not have dashboard or body cameras that evening. (*Id.* at 53). He stated that, at the time he was dispatched, he did not know that the information from the dispatcher was received through an anonymous call. (*Id.*). To his knowledge, no one followed up with the individual who made the anonymous call. (*Id.* at 54). Sergeant Spangler believed that Lieutenant Grooms and Officer Forsythe arrived at the scene within seconds after his arrival. (*Id.*). In discussing why he did not conduct surveillance, Sergeant Spangler remarked, "When you have a marked police car, you don't have the opportunity to conduct surveillance on a possible drug deal, so you roll up on them and ID them and see what's going on." (*Id.* at 55). When questioned why he took no action to corroborate the dispatch, Sergeant Spangler testified, "I believe the caller stated it was a white Chevy. I responded. It was a white Chevy alongside that building. Two occupants -- I observed two occupants at that point. It was more than enough for me to get out of the vehicle and approach the vehicle and investigate it further." (*Id.*). Sergeant Spangler explained that depending upon the

call taker and the dispatcher, the dispatcher sometimes advises that a call was anonymous. (*Id.* at 56). He disagreed that knowing the call was anonymous would have been helpful in his investigation, stating that "[i]t wouldn't have mattered" because he would have still gone to the scene and did exactly what he did. (*Id.*).

Sergeant Spangler conceded that Defendant did not appear to be breaking any laws when he approached him; that the car was parked; and that he did not observe any "no loitering" signs around the area. (*Id.* at 56-57). In discussing the history of arrests at 325 West Jefferson Street, Sergeant Spangler noted that as of July 20 or 21, 2016, the last time that he responded to an incident at the building was within weeks or months before. (*Id.* at 57). Defendant was not a subject of the prior incidents, as Sergeant Spangler had never previously encountered him. (*Id.* at 58). When questioned whether Defendant was reaching for the door handle and opening up the door to speak to him, Sergeant Spangler said, "He did speak with me, but he was also moving his eye [sic], the way he was staring off in the distance, in my past experience, he was looking for an escape route." (*Id.*). He reiterated that the only information as to the active warrant for Defendant was through the radio transmission. (*Id.* at 59).

With respect to the backpack, Sergeant Spangler believed that one of the other officers noticed it before pointing it out to him. (*Id.*). He did not know whether they had seen the backpack before or after the active warrant was discovered. (*Id.*). In again viewing the Government's photograph of the backpack, Sergeant Spangler testified that the lighting depicted was not the actual lighting in the area when the backpack was discovered. (*Id.* at 59-60; *see also* Docket No. 222-7). Rather, the photograph was taken at the garage to which the vehicle was transported. (Docket No. 230 at 60). Sergeant Spangler first observed the backpack after he placed Defendant in his patrol vehicle and walked to the driver's side of the vehicle. (*Id.*). Sergeant Spangler used

"a really bright flashlight," which "clearly illuminated that backpack and that large amount of money that was in that backpack with the zipper partially open." (*Id.*). He again acknowledged that he did not have the benefit of the lighting depicted in the photograph and stated that although it was dark outside, he saw the backpack as it is shown in the Government's exhibit with his flashlight. (*Id.* at 60-61). Sergeant Spangler also stated that the other officers looked at the back area of the vehicle with a flashlight. (*Id.* at 61). To Sergeant Spangler's knowledge, the other officers did not physically look inside the backpack. (*Id.*). After again listening to the audio recording of the dispatch call, Sergeant Spangler agreed that the caller had reported that the two individuals were dividing something up and putting it under their seat. (*Id.* at 61-62). He admitted that nothing was found underneath the seat and noted that the crack pipe was found under Defendant's lap. (*Id.*).

Returning to his arrival on the scene, Sergeant Spangler testified that he parked slightly behind the vehicle in the southern travel lane, (*id.* at 63), while the other officers were parked behind the vehicle in the parking lane on the street. (*Id.* at 64). He described why the rear lighting appeared to be shining in the front and in the back as follows:

> It should just be on -- I had my rear flashers on. I don't have my full take-down lights. I think it's more the reflection from the video, but the rear lighting, like I said, when you pull up to maybe a disabled motorist, you have the light bar, and on the back of the light bar, there's red and blues and a directional arrow that illuminates yellow.
>
> You can make the direction go right, left or if you turn it on, it flashes, like a caution arrow instead of full lighting or take-down, which would be the red and blues on the front, wigwags in the headlights where you would initiate a traffic stop.

(*Id.*). Sergeant Spangler speculated that an individual standing in front of a patrol unit may or may not know the difference between rear lighting and front lighting. (*Id.* at 65). While viewing the video footage, Sergeant Spangler observed that an individual came out of a door at approximately

12:05 a.m. but acknowledged that he did not observe that individual when he was at the scene on July 21, 2016. (*Id.* at 65-66).

When Sergeant Spangler was shown Defendant's Exhibit A, he identified it as a photograph of 321 West Jefferson Street but could not recall, with the telephone pole as a mark, where the vehicle in which Defendant was seated was parked. (*Id.* at 66). In discussing Defendant's remaining exhibits, Sergeant Spangler testified that Defendant's Exhibit B depicted a red brick building that is 325 West Jefferson Street; that Defendant's Exhibit C was a photograph of two vehicles that he did not recall being at the scene that night; and that Defendant's Exhibit D showed a Google satellite view of the north side of 325 West Jefferson Street. (*Id.* at 67-68; *see also* Docket Nos. 222-9, 222-10, 222-11). He agreed that there are three or four parking spots available in front of the building on 325 West Jefferson Street. (Docket No. 230 at 69). He concluded that Defendant did not indicate that the backpack was his, that Defendant's Pennsylvania identification card was found inside the backpack; and that the vehicle was not reported as stolen. (*Id.* at 69-70).

### 3. Lieutenant Grooms' Testimony

The Government called Lieutenant Grooms as its second witness. (*Id.* at 72). He testified that he is currently employed as a lieutenant for the City of Butler Police Department. (*Id.*). He explained that he has been serving as a police officer for nearly twenty-eight years and that he has been employed by the City of Butler Police Department since October 2000. (*Id.* at 72-73). Shortly before this incident, Lieutenant Grooms was promoted to a sergeant position, and he has since been promoted to a lieutenant position. (*Id.* at 73). As a lieutenant, he is a shift supervisor and continues to complete his officer duties, such as patrolling, stopping cars, and writing tickets. (*Id.* at 74). He has also served as the K-9 handler for the department since 2012. (*Id.*). He

explained that the officers within the department work on two-week rotations, with two weeks of shifts from 8:00 a.m. until 8:00 p.m. and two weeks of shifts from 8:00 p.m. until 8:00 a.m. (*Id.* at 74-75).

In discussing July 20, 2016, Lieutenant Grooms testified that he was working from 8:00 p.m. until 8:00 a.m. and that he received a dispatch just around midnight advising that people in a white car in the area of 325 West Jefferson Street were selling drugs. (*Id.* at 75-76). He was familiar with the address because it is a large apartment building that has had "a lot of trouble," including "[e]verything from domestics to robberies, drug activity." (*Id.* at 76). He recalled that an anonymous individual called 911 and that the 911 center then directed him to the address. (*Id.*). Lieutenant Grooms arrived at the scene approximately five to ten seconds after Sergeant Spangler's arrival. (*Id.* at 77). He was in his patrol car, which was a 2005 blue unmarked Crown Victoria that had lights and "caution K-9" on the doors. (*Id.*). It did not have a light bar on top of the vehicle. (*Id.*). Lieutenant Grooms noted that the white car was legally parked in the parking lane and that he parked directly behind the car, also in the parking lane. (*Id.* at 77-78). He was not directly behind Sergeant Spangler's vehicle, as Sergeant Spangler was parked behind the white car in the travel lane. (*Id.* at 78). He also stated that Officer Forsythe arrived at the scene in his marked patrol car, with a light bar on top, and that he parked directly behind his vehicle. (*Id.* at 78-79). He was uncertain whether Officer Forsythe's overhead lights were activated. (*Id.* at 79).

Upon his arrival at the scene, Lieutenant Grooms saw Sergeant Spangler getting out to talk to the passenger. (*Id.*). He approached the driver's side, stood on the sidewalk at the door post, and spoke to the operator. (*Id.*). He observed two occupants in the front seat of the vehicle and recognized the driver as Ms. Claypool. (*Id.* at 79-80). He knew Ms. Claypool by her name through his prior dealings with her, as she had previously been arrested for drugs. (*Id.* at 80). Although

Lieutenant Grooms had never personally arrested Ms. Claypool, the officers within the department discuss arrests and encounters and read reports that have been completed during previous shifts. (*Id.*). While standing on the sidewalk, Lieutenant Grooms shined his flashlight in the car, at which point he noticed a backpack directly behind Ms. Claypool's seat. (*Id.* at 80-81). When shining his flashlight on the backpack, Lieutenant Grooms observed a small pouch, located on the front of the backpack, that was unzipped and contained a large wad of cash. (*Id.* at 81).

Upon viewing Government Exhibit 4, Lieutenant Grooms confirmed that he had taken the photograph of the backpack depicted in same. (*Id.*; *see also* Docket No. 222-7). He testified that he had not removed the backpack from the vehicle prior to taking the photograph and that the photograph depicts the backpack as it was when he first saw it. (Docket No. 230 at 82). To this end, Lieutenant Grooms believes that he had taken photographs at the scene and at the fire department to which the vehicle was towed. (*Id.* at 83). Although he did not know at which point he took the particular photograph, he stated that it was "consistent with what I saw from the curb." (*Id.*).

After he observed the money in the backpack, Lieutenant Grooms alerted Sergeant Spangler, gave him the money sign with his fingers, and pointed to the backpack. (*Id.*). At that point, Sergeant Spangler was speaking to Defendant at the passenger-side front window while Defendant was inside the vehicle. (*Id.*). Lieutenant Grooms saw that Defendant "appeared to be getting nervous and wanting to get out of the car." (*Id.* at 83-84). He heard Sergeant Spangler instructing Defendant to remain in the vehicle. (*Id.* at 84). Lieutenant Grooms then removed his canine, Gunner, from his car and stood at the rear passenger side corner of the car while Sergeant Spangler continued to speak to Defendant. (*Id.*). He testified that he decided to retrieve Gunner "[b]ecause from just what I could see and from Sergeant Spangler, I kind of thought maybe the

guy might want to try to get away from us, run, fight, do whatever." (*Id.*). He used Gunner as a deterrent, noting that "[a] lot of times, people are less inclined to do that with my dog standing by, so I stood there at the rear of the car." (*Id.*).

Lieutenant Grooms stated that Sergeant Spangler asked Defendant to exit the vehicle a few minutes later because there was no record found for Jeffrey Bowra in the state. (*Id.* at 84-85). When he heard Sergeant Spangler running the name, "I kind of said into the vehicle are you sure your name is not Scott Bowra, because I had dealt with a Scott Bowra before." (*Id.* at 85). At the time, Lieutenant Grooms did not know how he knew the name Scott Bowra. (*Id.* at 85-86). After Lieutenant Grooms mentioned Scott Bowra, the 911 center located an arrest warrant for that individual, and Sergeant Spangler asked Defendant to exit the vehicle to confirm his identification. (*Id.* at 86). Defendant complied and was detained. (*Id.*).

With respect to his canine, Lieutenant Grooms explained that Gunner is certified in narcotics detection. (*Id.* at 87). After Defendant was inside a patrol car, Lieutenant Grooms used Gunner to complete an exterior sniff of the vehicle. (*Id.*). Specifically, he started Gunner at the driver's side rear corner of the vehicle and worked counterclockwise around the vehicle. (*Id.*). At the front seam of the front passenger side door, Gunner indicated the presence of narcotics. (*Id.*).

On cross examination, Lieutenant Grooms testified that the officers "probably would have stopped the vehicle" if it had driven away from the scene. (*Id.*). He disagreed that Defendant and Ms. Claypool were seized upon the officers' approach, stating that "we were just talking to them" and that "[a]t no point did they say they wanted to leave." (*Id.* at 88). He acknowledged that Defendant and Ms. Claypool were not engaged in any illegal activity that was obvious to his eye when he approached the vehicle. (*Id.*). As to the 911 call, Lieutenant Grooms said that, at the time, he did not know the report was made by an anonymous caller. (*Id.*). Specifically, he testified,

"All I know is it came across as probably a caller advised that there [were]people in the car dealing drugs." (*Id.*). Lieutenant Grooms did not learn that the caller was anonymous until he checked the 911 records at a later point in time. (*Id.* at 88-89).

Lieutenant Grooms believed that he left the scene when he followed the tow truck that was towing the vehicle. (*Id.* at 89). When questioned whether he activated his lights, Lieutenant Grooms responded:

> I don't know if I turned them on. Once Sergeant Spangler left, I may have. I don't remember. It could have been just a safety thing, because we parked along the side of the road.
>
> I know Sergeant Spangler had his lights on for a little while, but I don't recall whether I turned my lights on once he shut his off and left. I would assume I probably did just to help give the wrecker a location as far as finding us, come to the lights, but I can't say whether I did or not.

(*Id.* at 89-90). As to his reasoning for using his flashlight, Lieutenant Grooms stated, "I always do. I've done it for 28 years. If I'm standing next to a car, I shine my light in the car to see what's in there, who's in there." (*Id.* at 90).

As to Gunner, Lieutenant Grooms further described him as a German Shepherd used for exterior sniffs. (*Id.* at 91). When Gunner detects narcotics, he indicates to Lieutenant Grooms by sitting. (*Id.*). Specifically, Lieutenant Grooms notices a change in Gunner's posture and behavior because "[h]e'll go by the odor, and he'll head snap and start breathing heavier, taking deeper inhalations trying to pinpoint where the odor is from." (*Id.*). Gunner engaged in this behavior when he reached the front seam of the passenger side front door. (*Id.* at 92). Lieutenant Grooms did not allow Gunner to enter the car at any time. (*Id.*).

Lieutenant Grooms recalled that Sergeant Spangler directed Defendant to keep the door shut. (*Id.*). He believed that the window was down at the time, but he could not fully see the interaction between the two because he is 6'2" and was elevated on the sidewalk. (*Id.* at 92-93).

Lieutenant Grooms reiterated that he did not know whether he took the photograph depicted in Government Exhibit 4 at the scene or at the fire department because he had taken one photograph at each location and that this photograph was consistent with what he saw at the scene. (*Id.* at 93). While at the scene, Lieutenant Grooms was able to determine that the backpack contained a large amount of United States currency because, through his experience, he observed what looked like a stack of cash that was folded in half. (*Id.* at 94). He gave Sergeant Grooms the money sign "because we had a complaint of possible drug sales or drug use in that vehicle, and a lot of times, money and drugs go together." (*Id.*).

### 4. Defendant's Testimony

After the Government indicated that it had no further witnesses, defense counsel called Defendant as a witness. (*Id.* at 98). Defendant testified that he was seated in a white Chevrolet Impala that was parked in front of 325 Jefferson Street with Ms. Claypool on July 21, 2016. (*Id.* at 98-99). When he noticed the presence of police officer, Defendant's first thought was, "What did I do?" (*Id.* at 99). He recalled that Sergeant Spangler spoke directly to him. (*Id.*). He also noted that the window was not operating properly because it "kept getting stuck." (*Id.*).[5] When Sergeant Spangler approached, Defendant tried to roll the window down by "play[ing] with the automatic button," but the window did not roll down. (*Id.* at 100). He motioned to Sergeant Spangler that he had to open the door and was opening the door as he was speaking to him. (*Id.*).[6] He recalled Sergeant Spangler instructing him to remain in the vehicle and stated that he did not

---

[5] Defense counsel questioned Defendant as to the operability of the window "on the driver's side." (*Id.*). However, on cross examination, Defendant clarified that the window on the passenger's side was not operating properly. (*Id.* at 102).

[6] During Sergeant Spangler's testimony, he stated that he did not recall whether the window was working and that Defendant opened the door to speak with him. (*Id.* at 58). Lieutenant Grooms believed that the window was down but did not know whether it was operable. (*Id.* at 92). The Court finds Sergeant Spangler and Lieutenant Grooms to be credible despite the fact that they differed on whether the window was operative, as Lieutenant Grooms explained that given his height and location, he could not see everything on the passenger's side of the vehicle. (*Id.* at 92-93).

intend to flee.  (*Id.* at 100).

With respect to the officers' activity around the vehicle, Defendant testified that he knew the officers were behind him, that Lieutenant Grooms was on the driver's side, and that Sergeant Spangler was on the passenger's side.  (*Id.* at 101).  He noted that the driver's side door was open because Ms. Claypool "was getting ready to get out of the car."  (*Id.*).  The rear passenger door was closed.  (*Id.*).  Defendant confirmed that he was asked to exit the vehicle and was placed under arrest.  (*Id.* at 101-02).

On cross examination, Defendant stated that he motioned to Sergeant Spangler, "pointing like it doesn't work right, so I didn't just want to open up the door" and "letting [Sergeant Spangler] know I'm about to open it up."  (*Id.* at 102).  Defendant believed that Sergeant Spangler understood and that he explained to him why he opened the door.  (*Id.* at 102-03).  In describing Sergeant Spangler's demeanor, Defendant testified that "he just asked me what I was doing."  (*Id.* at 103).  Defendant sarcastically responded that he was smoking a cigarette because Sergeant Spangler could see that he was smoking a cigarette.  (*Id.*).  Sergeant Spangler did not scream at him.  (*Id.*).  Defendant described their interaction as "short" and was "[a]bout a few minutes, maybe four, something like that."  (*Id.*).  It was not until after this short interaction that Sergeant Spangler asked Defendant to remain in the car.  (*Id.*).  Defendant also noted that Ms. Claypool was about to get out of the car when the officers approached.  (*Id.* at 103-04).

### 5.  Mary Hutchison's Testimony

Defense counsel next called Mary Hutchison, who is Defendant's aunt.  (*Id.* at 105).  She stated that Defendant was living with her around July 2016.  (*Id.*).  With respect to July 20, Ms. Hutchison testified that Defendant called that day and asked if he could come to visit her because the two had not seen each other for a few weeks.  (*Id.* at 105-06).  Ms. Hutchison was not at home

when he arrived. (*Id.* at 106). In viewing the video footage, (Docket No. 222-1), Ms. Hutchison opined that she was one of the individuals shown walking around the building. (Docket No. 230 at 105-06). She believed that she paused in front of the building because she did not know whose car was parked in front of the building, as she did not know what Defendant's car looked like or what the car in which he was riding looked like. (*Id.* at 107). When Defendant spoke, Ms. Hutchison recognized that it was him and told him he could come inside her apartment. (*Id.*).

Ms. Hutchison advised that she previously lived in the front part of the apartment building that faced West Jefferson Street. (*Id.*). She stated that she became aware of police activity in front of the building when she saw flashing lights coming through her window. (*Id.* at 108). From a window in her apartment, Ms. Hutchison saw that "one police officer was in behind the vehicle, and it was two vehicles on the side of the vehicle." (*Id.*). She watched the encounter between Defendant and the police officers. (*Id.*). She then went outside and talked to the officers. (*Id.* at 109). In further describing the police cars, Ms. Hutchison stated, "One was parked right behind the vehicle, the one that he was in, and the other two was [sic] parked like catty corner on the side of the vehicle, on the passenger side." (*Id.* at 109-10).

Ms. Hutchison explained that after she saw two officers were standing on the sidewalk, she spoke to one while the other looked in the backseat with a flashlight. (*Id.* at 110). When the officer informed Ms. Hutchison that an anonymous caller had reported a drug transaction, she told him, "[T]his is my nephew, you know, and stuff. He was just coming to visit me, and there wasn't nothing [sic] like that going down." (*Id.*). One officer advised Ms. Hutchison to return to her apartment, and another asked for the defendant's name and asked about a different name. (*Id.* at 111). Ms. Hutchison testified that she had no doubt in her mind that the officers had informed her that the caller was anonymous. (*Id.*). She stated that while she was speaking with one officer, the

other opened the rear door on the driver's side, leaned into the vehicle, and used his flashlight to look inside. (*Id.* at 111-12).[7] Ms. Hutchison did not observe any of the officers physically enter the vehicle, and she did not see a backpack. (*Id.* at 112). She did not know how long she remained outside but returned to her apartment at some point. (*Id.*). Ms. Hutchison attempted to speak to Defendant, but the officers told her to go inside. (*Id.*). Defendant asked Ms. Hutchison to tell the officers that he was her nephew and that he was visiting her. (*Id.* at 112-13). After returning to her apartment, Ms. Hutchison saw the officers take Defendant out of the vehicle and place him inside the patrol car. (*Id.* at 113). While viewing video footage, Ms. Hutchison confirmed that she was standing at the front door. (*Id.* at 114). Based upon the video's time stamp, she agreed that she was outside talking to the officers for at least three minutes. (*Id.*).

On cross examination, Ms. Hutchison stated that she lived at 325 West Jefferson Street for three or four months and that she was living there on the day that this incident occurred. (*Id.* at 115). She explained that she was walking around the building that night because she was returning from her boyfriend's house, which was about a ten-minute walk away from the apartment building. (*Id.* at 116). She did not have any alcohol while she was at her boyfriend's house. (*Id.* at 116-17). As to Defendant's living situation, Ms. Hutchison testified that "before he came to my house the first time, I haven't [sic] seen him for awhile [sic], and then he came to my house, and then he left for probably like a day." (*Id.* at 117). She stated that Defendant asked if he could return and that she had said yes. (*Id.*). She did not know at what time Defendant would arrive at her apartment, and she was looking for him when she returned from her boyfriend's house. (*Id.* at 117-18). Ms.

---

[7] As outlined above, the Court determines credibility in this context. *See infra* at 5-6. Given that Ms. Hutchison is Defendant's aunt, the Court finds that she may have some bias in favor of her nephew. Further, Ms. Hutchison's testimony was not consistent, as she reversed herself with respect as to which car door was opened. Ms. Hutchison's testimony was consistent on some points with the officers' testimony but, as indicated previously, she also provided testimony which the Court believes she tilted in favor of her nephew.

Hutchison reiterated that she saw Defendant in the white vehicle before the police officers arrived and that she realized the police officers were there when she saw lights from her window. (*Id.* at 118-19).

Ms. Hutchison said that when she went outside, she recognized the officers, but did not know their names, even though she had previously worked for the Butler City Police Department as a crossing guard and she had called 911 on numerous occasions to file reports during her history of living in Butler City. (*Id.* at 119-20). She testified that she was standing a few feet away from the car when she saw one of the officers looking inside while the car door was open. (*Id.* at 120). When further questioned regarding the open door, Ms. Hutchison stated that "[t]he passenger car door was closed and the back door was opened." (*Id.* at 121). When asked what she meant by "the passenger door," Ms. Hutchison reversed herself, saying that "the driver's door was closed and the door behind the passenger was opened." (*Id.*).

On redirect examination, Ms. Hutchison clarified that when she stated that she had not seen Defendant for several weeks, she was referring to the period before he came to stay with her. (*Id.* at 122). When Defendant called and asked to visit on the night of the incident, Ms. Hutchison had not seen him for a day or so. (*Id.*). She repeated that the driver's door was closed when she was outside, (*id.*), and the door behind the driver's door was opened. (*Id.* at 123). She did not see any of the other doors on the other side of the vehicle. (*Id.*).[8] After the Court's questioning did not cause either attorney to have additional questions, Ms. Hutchison was excused. (*Id.* at 129).

Next, counsel offered a joint exhibit that is a time sequence of the 911 call created by Butler County 911. (*Id.* at 130; *see also* Docket No. 222-12). Government counsel proffered that the exhibit reflects the times of various events that were called out back and forth over the radio.

---

[8] During the Court's questioning, Ms. Hutchison testified that she did not see anyone open the car door. (*Id.* at 126).

(Docket No. 230 at 130). Defense counsel noted that a query for Jeff Bowra occurred at 00:05 and that 00:07, or 12:07 a.m., is when the information concerning the warrant was delivered to the police officer. (*Id.* at 131; *see also* Docket No. 222-12 at 2). The parties confirmed that they had no other documents to be entered into evidence. (Docket No. 230 at 131). After discussing the preparation of the transcript and the deadlines in this matter, the Court ended the hearing. (*Id.* at 132-33).

### C. *Relevant Procedural History*

The Indictment in this matter was filed on August 2, 2016. (Docket No. 21). Defendant is charged at Count Four of the Indictment with possession with intent to distribute a quantity of heroin and crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), on or about July 21, 2016. (*Id.* at 5). Defendant filed the instant motion to suppress on February 26, 2017. (Docket Nos. 120, 121). The Government filed a response in opposition on October 20, 2017, to which Defendant replied on November 13, 2017. (Docket Nos. 184, 200). On November 14, 2017, Defendant filed a motion to amend his motion to suppress, and the Government responded on November 21, 2017. (Docket Nos. 201, 208). On November 29, 2017, the Court granted Defendant's motion to amend to the extent that he sought to argue that all evidence in this matter should be suppressed, stating that it will consider all arguments raised by the parties in their briefing and at the scheduled hearing. (Docket No. 215). As outlined above, the Court held a hearing on December 11, 2017, a transcript of the proceedings was filed on January 18, 2018, and the parties submitted findings of fact and conclusions of law, which the Court will now address.

### III. DISCUSSION

### A. *Warrantless Stop*

Defendant argues that the officers did not have reasonable suspicion to seize him and that

all physical evidence resulting from the seizure is the fruit of an illegal stop. The Fourth Amendment protects citizens against unreasonable searches and seizures. U.S. CONST. AMEND. IV; *see also United States v. Ubiles*, 224 F.3d 213, 216 (3d Cir. 2000). Warrantless searches are per se unreasonable, subject only to a few specifically established and well delineated exceptions. *Horton v. California*, 496 U.S. 128, 133 (1990). Because no warrant authorized the stop of the vehicle, the burden is on the Government to prove by a preponderance of the evidence that the search fell within one of the recognized exceptions to the warrant requirement. *United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992). One exception to the warrant requirement is the *Terry* stop and frisk. *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968). Another exception to this requirement is a lawful inventory search. *See United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010). Further, the automobile exception authorizes searches absent a warrant. *See United States v. Salmon*, 944 F.2d 1106, 1120 (3d Cir. 1991), *abrogated on other grounds by*, *United States v. Caraballo-Rodriguez*, 726 F.3d 418 (3d Cir. 2013) (en banc). Any evidence obtained pursuant to a search that does not meet a recognized exception to the warrant requirement must be suppressed as "'fruit of the poisonous tree.'" *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (quoting *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)).

Generally, *Terry* permits a police officer to conduct "a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30). "[I]n a traffic-stop setting, the first *Terry* condition—a lawful investigatory stop—is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). It is well established that officers are permitted to pull over a car suspected of violating any applicable vehicular traffic laws. *United States v. Bonner*, 363 F.3d 213, 216 (3d

Cir. 2004). No further suspicion of criminal activity by the driver of the vehicle or the passengers therein is necessary to justify the *Terry* stop of the vehicle. *Johnson*, 555 U.S. at 327.

Although reasonable suspicion is less demanding than probable cause, the Fourth Amendment requires that an officer making a stop have some level of objective justification for that stop. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Reasonable suspicion, while not rigidly defined, may be the result of any combination of one or several of the following factors: "specialized knowledge and investigative inferences," "personal observation of suspicious behavior," "information from sources that prove to be reliable, and information from sources that—while unknown to the police—prove by the accuracy and intimacy of the information provided to be reliable at least as to the details contained within that tip." *United States v. Brown*, 448 F.3d 239, 247 (3d Cir. 2006) (internal quotations omitted). In evaluating reasonable suspicion and whether a particular stop was justified, courts must examine the totality of the circumstances surrounding the stop. *Sokolow*, 490 U.S. at 8.

With respect to the officer's actions, courts must defer to "[his] knowledge of the nature and nuances of the type of criminal activity that he had observed in his experience, almost to the point of permitting it to be the focal point of the analysis." *United States v. Nelson*, 284 F.3d 472, 482 (3d Cir. 2002)). To this end, the United States Court of Appeals for the Third Circuit has counseled that courts should be reluctant "to second-guess the investigative decisions made by the law enforcement officers on the scene." *United States v. Edwards*, 591 F. App'x 156, 159 (3d Cir. 2014). Similarly, courts often defer to an officer's personal observations and conclusions on the theory that experienced officers can infer criminal activity from conduct that may seem innocuous to a lay person. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *see also Wardlow*, 528 U.S. at 124.

The Third Circuit has applied the so-called "'collective knowledge doctrine'—under which the knowledge of one law enforcement officer is imputed to the officer who actually conducted the seizure, search, or arrest," *United States v. Whitfield*, 634 F.3d 741, 745 (3d Cir. 2010), in various circumstances, including reasonable suspicion to conduct a *Terry* stop and frisk, *id.*; probable cause for a warrantless arrest, *see United States v. Belle*, 593 F.2d 487, 497 n.15 (3d Cir. 1979); and, seizures under the plain view doctrine, *see United States v. Menon*, 24 F.3d 550, 562 (3d Cir. 1994). The collective knowledge doctrine allows officers "'to act on the strength' of work done by fellow officers" when they are engaged in joint law enforcement activities. *United States v. Gonzalez*, 630 F. App'x 157, 161 (3d Cir. 2015) (quoting *Whiteley v. Warden*, 401 U.S. 560, 568 (1971)). "Under the rule, determinations concerning the existence of reasonable suspicion can be made based on the knowledge of the officer conveying the information, not on 'whether those relying on the [information] were themselves aware of the specific facts which led their colleagues to seek their assistance.'" *Id.* (quoting *United States v. Hensley*, 469 U.S. 221, 231 (1985)).

"The initial step in our suppression analysis is to determine whether a seizure has taken place and, if so, when the seizure occurred." *United States v. Brown*, 765 F.3d 278, 288 (3d Cir. 2014) (citing *United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008); *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003)) (stating that in conducting a suppression analysis, the court "must first determine at what moment [the defendant] was seized"). A Fourth Amendment seizure "does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Likewise, an officer shining a flashlight into the interior of a vehicle from a position outside the vehicle does not constitute a seizure. *See Texas v. Brown*, 460 U.S. 730, 739-40 (1983) ("It is likewise beyond dispute that Maples' action in shining his flashlight to illuminate the interior of Brown's car trenched upon no right secured to the latter

by the Fourth Amendment."). Rather, "[a] seizure occurs only 'when [a police officer], by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *United States v. Crandell*, 554 F.3d 79, 84 (3d Cir. 2009) (quoting *Terry*, 392 U.S. at 19-20 n.16)).

"The 'show of authority' test 'is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person' in light of all the surrounding circumstances." *Id.* (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). Circumstances that may indicate a seizure include: "'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *Id.* at 85 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554-55 (1980)). Additionally, a seizure occurs when a police officer uses physical force to restrain a suspect or when a suspect submits to an assertion of authority. *Hodari D.*, 499 U.S. at 626; *accord United States v. Valentine*, 232 F.3d 350, 358 (3d Cir. 2000) ("[F]or there to be a seizure, the police must apply physical force to the person being seized, or where force is absent, have the person seized submit to a show of police authority"). Such a submission to authority occurs when the suspect "manifest[s] compliance with police orders." *United States v. Waterman*, 569 F.3d 144, 146 n.3 (3d Cir. 2009) (citing *Couden v. Duffy*, 446 F.3d 483 (3d Cir. 2006)).

Here, the Government contends that the earliest point in time that the Fourth Amendment seizure occurred was when Sergeant Spangler requested that Defendant remain in the vehicle. (Docket No. 184 at 9). Defendant suggests that the seizure took place at an earlier point in the encounter, i.e., when Sergeant Spangler, with the patrol vehicle's emergency lights activated, pulled up behind the parked vehicle in which he was a passenger. (Docket No. 121 at 4). Having

carefully considered the parties' positions in light of the totality of the credible facts established at the hearing, the Court concludes that the officers pulling up behind the parked vehicle constituted a mere encounter that did not ripen into a seizure for Fourth Amendment purposes until Sergeant Spangler ordered Defendant to stay seated in the vehicle.

To this end, Sergeant Spangler was dispatched to the area of 325 West Jefferson Street for a report of two individuals in a white Chevy Impala possibly completing a drug transaction. (Docket No. 120-2 at 4; Docket No. 201-2 at 2; Docket No. 201-3 at 1). Sergeant Spangler testified that he had responded to numerous calls at the apartment building located on 325 West Jefferson Street. (Docket No. 230 at 19). He described the neighborhood as "somewhat of a high drug area" and stated that he encountered multiple warrant arrests and arrests for domestic disputes and drug calls at the apartment building. (*Id.*). Sergeant Spangler described West Jefferson Street as a one-way street with two westbound lanes and a parking lane on both sides of the street. (*Id.* at 26). He was the first officer to arrive on the scene. (*Id.* at 28). Upon his arrival in a marked police unit, Sergeant Spangler located a vehicle fitting the description, i.e., two individuals in a white Chevy possibly completing a drug transaction, pulled in the southern travel lane behind the car, and activated his rear lights. (*Id.* at 27-28). He explained that his rear lights make motorists aware that his vehicle is a police car and he activated the lights for his safety, given that he was parked in the travel lane. (*Id.* at 29-30).

The Court finds that at this juncture, Sergeant Spangler had at least reasonable suspicion that the occupants were involved in drug trafficking activity given the totality of the circumstances, i.e., responding to a report that two individuals in a Chevy Impala in the area of 325 West Jefferson Street were completing a drug transaction, arriving in the area and observing two individuals sitting in a parked Chevy Impala, with the engine off, in a high crime area. *See, e.g., United States v.*

*Edmonds*, No. 12-CR-70, 2013 U.S. Dist. LEXIS 160773, at *33 (W.D. Pa. Nov. 12, 2013), *aff'd*, 606 F. App'x 656 (3d Cir. 2015) ("[T]he officers' awareness of prior violent crimes having occurred in the general vicinity is certainly one of the factors which must be considered in the evaluation of all of the evidence.").  Indeed, Sergeant Spangler testified that the City of Butler Police Department had installed a street camera on the northwest corner of Jefferson and Chestnut Streets.[9]

With respect to the lights and the positioning of the vehicles, Sergeant Spangler activated his rear lights for safety purposes because he parked in the southbound travel lane.  (Docket No. 230 at 27-30).  Under these circumstances, and given that it was after midnight, it was reasonable for Sergeant Spangler to activate his rear lights.  *See, e.g.*, *United States v. Morales-Ruiz*, No. 08-CR-454, 2009 U.S. Dist. LEXIS 101786, at *2 (M.D. Pa. Nov. 2, 2009) (finding that "[t]he troopers activated the lights on their patrol car for safety reasons"); *United States v. Neal*, No. 05-CR-182, 2006 U.S. Dist. LEXIS 12369, at *7 (W.D. Pa. Mar. 7, 2006), *aff'd on other grounds*, 271 F. App'x 233 (3d Cir. 2008) (finding that the defendant was not seized because the

---

[9] The totality of these circumstances further demonstrate that the anonymous call gave rise to a reasonable suspicion. *See United States v. Robinson*, No. 09-CR-473, 2010 U.S. Dist. LEXIS 113204, at *5-6 (E.D. Pa. Oct. 22, 2010) (explaining that a "totality of the circumstances" test if used to determine whether an anonymous tip could give rise to a reasonable suspicion); *see also United States v. Parker*, 467 F. App'x 120, 122 (3d Cir. 2012) ("When reasonable suspicion is based on information obtained from an anonymous source, the tip must exhibit 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop' without further independent investigation.") (quoting *Alabama v. White*, 496 U.S. 325, 332 (1990)).  Here, the officers were not advised that the caller was anonymous.  (*See* Docket No. 230 at 53-56, 88-89).  Further, "this is not an instance where the police relied only on an anonymous tip to justify an investigative stop."  *Parker*, 467 F. App'x at 123 (explaining that that question presented was "whether an anonymous tip . . . is, *without more*, sufficient to justify a police officer's stop") (emphasis in original) (internal quotations omitted).  As discussed above, the officers arrived at the address and found two individuals sitting in a parked Chevy Impala, all of which matched the dispatcher's report.  Thus, although the anonymous call may not have been sufficiently reliable to justify the stop, the totality of the circumstances establish that the officers had reasonable suspicion to make the stop.  *See id.* (finding that the stop was justified where the officers arrived in an area that had a reputation for mid-level crime and found a vehicle matching the flash description); *Robinson*, 2010 U.S. Dist. LEXIS 113204, at *8-9 (concluding that the officer had reasonable suspicion after he observed that the defendant matched the flash description of a light-complexioned black male wearing a tan shirt and blue pants who was nervous); *see also United States v. Goodrich*, 450 F.3d 552, 562-63 (3d Cir. 2006) (holding that the discovery of the suspect within two blocks of the alleged crime scene, with no other occupied vehicles present, "militat[ed] strongly in favor of the validity of the stop").

officers activated the emergency lights on the patrol vehicles solely for safety reasons); *see also United States v. Hicks*, No. 08-CV-271, 2009 U.S. Dist. LEXIS 87884, at *11-12 (E.D. Pa. Sept. 23, 2009) (explaining that "[a] uniformed police officer, who would be expected to carry a gun, may approach a legally parked vehicle and ask the occupants questions without implicating the Fourth Amendment" and that "[a] consensual citizen encounter includes posing questions and requesting identification") (citing *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 185 (2004)). As to the positioning of the vehicles, the white vehicle was parked in the parking lane; Sergeant Spangler was parked behind the white vehicle in the southbound travel lane; Lieutenant Grooms was parked directly behind the white vehicle, also in the parking lane; and Officer Forsythe was parked directly behind Lieutenant Grooms' vehicle. (Docket No. 230 at 28-30, 51, 63-64, 77-79). The testimony offered at the motion hearing regarding the positioning of the vehicles is further confirmed by video footage. (Docket No. 222-1). Thus, the Court finds that the officers did not block or control the movement of the white vehicle. *See, e.g.*, *Neal*, 2006 U.S. Dist. LEXIS 12369, at *7 (finding that the defendant was not seized because the officers did not block his path or control his movement).

Sergeant Spangler then approached the vehicle and spoke to Defendant, who was seated in the passenger seat. (Docket No. 120-2 at 4; Docket No. 201-2 at 2; Docket No. 230 at 31-33, 51, 84). Defendant identified himself as Jeffrey Bowra, stated that he had no identification, and provided a date of birth of 4/16/76. (Docket No. 120-2 at 4; Docket No. 201-2 at 2; Docket No. 230 at 33, 44-45, 84-85). At this point, Lieutenant Grooms arrived at the scene and spoke with the driver while Sergeant Spangler continued to speak to Defendant. (Docket No. 201-3 at 1; Docket No. 230 at 51, 79-81). Sergeant Spangler reported that Defendant "kept grabbing the door latch, looking into the distance as though he was considering taking off." (Docket No. 120-2 at 4; Docket

No. 230 at 31-32, 35-36; *see also* Docket No. 201-2 at 2 (wherein Sergeant Spangler stated that Defendant "was nervous and kept his hand on the door handle, as though he was preparing to flee the vehicle")). Likewise, Lieutenant Grooms "noticed that [Defendant] kept opening the car door up, and appeared to be nervous." (Docket No. 201-3 at 1; Docket No. 230 at 83-84). In response to Defendant's conduct, Sergeant Spangler "told [Defendant] several times to relax and stay in the vehicle." (Docket No. 201-2 at 2; Docket No. 230 at 35-36, 84).

It is the Court's opinion that the earliest point in time that a seizure occurred was when Sergeant Spangler directed Defendant to remain in the vehicle because a reasonable person in Defendant's position would feel that his liberty was restrained by a law enforcement officer taking that type of action. *See, e.g.*, *United States v. Gardenhire*, No. 15-CR-87, 2017 U.S. Dist. LEXIS 37657, at *20-24 (W.D. Pa. Mar. 16, 2017) (holding that the officers approaching the vehicle, knocking on the windows of the vehicle, asking the occupants to roll down the windows, asking questions, and shining flashlights into the vehicle did not constitute a seizure and that the seizure occurred when the officers forcefully opened the door to the vehicle).

With that said, the Court also finds that, as outlined above, Sergeant Spangler had reasonable suspicion prior to approaching the vehicle and, therefore, had reasonable suspicion to order Defendant to remain in the vehicle as an investigatory stop which was fully justified by the totality of the facts and circumstances. *See Wardlow*, 528 U.S. at 123 ("[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."). Again, Sergeant Spangler responded to a report that two individuals were completing a drug transaction in a Chevy Impala in the area of 325 West Jefferson Street, Sergeant Spangler observed two individuals sitting in a parked Chevy Impala, with the engine off, in a high crime area. Having reviewed the totality of

the objective facts in this scenario, the Court concludes that Sergeant Spangler had reasonable suspicion to conduct a brief investigatory detention in the manner that he did in this case. *See United States v. Cortez*, 449 U.S. 411, 417-18 (1981) (stating that a court must look to the "totality of the circumstances - the whole picture" to determine whether the officer had "particularized and objective basis for suspecting the particular person stopped of criminal activity").

Moving on, after ordering Defendant to remain in the vehicle, Sergeant Spangler searched for Jeffrey Bowra through the Pennsylvania Department of Transportation and found a warrant for Defendant, Scott Bowra, with the same date of birth. (Docket No. 120-2 at 4; Docket No. 201-2 at 2). At this point, having located the outstanding arrest warrant, Sergeant Spangler had probable cause to arrest Defendant. *See, e.g.*, *Utah v. Strieff*, 136 S. Ct. 2056, 2061-62 (2016) (holding that the discovery of a valid arrest warrant was a sufficient intervening event to break the causal chain between an unlawful stop and the discovery of drug-related evidence on the suspect's person and stating that "once Officer Fackrell discovered the warrant, he had an obligation to arrest Strieff" because "[a] warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions") (internal quotations omitted); *United States v. Zareck*, No. 09-CR-168, 2011 U.S. Dist. LEXIS 124056, at *33 (W.D. Pa. Oct. 26, 2011) (explaining that the Superior Court of Pennsylvania has held that "[an] NCIC report of outstanding arrest warrant provides probable cause to arrest") (quoting *Commonwealth v. McRae*, 5 A.3d 425, 430 (Pa. Super. Ct. 2010)); *United States v. Barr*, 454 F. Supp. 2d 229, 253 n.41 (E.D. Pa. 2006) (holding that the officer "made a valid arrest pursuant to the outstanding arrest warrant"); *United States v. Dryden*, 567 F. Supp. 2d 643, 650-51 (D. Del. 2008) ("An outstanding arrest warrant is indicative of an independent judicial judgment that probable cause existed to believe that the subject of the warrant had violated the law.") (citing *Whiteley v. Warden, Wyo. State Penitentiary*,

401 U.S. 560, 568 (1971)).

Sergeant Spangler asked Defendant to exit the vehicle, at which point he observed a crack pipe on the passenger seat where Defendant was seated. (Docket No. 120-2 at 4; Docket No. 201-2 at 2; Docket No. 201-3 at 1). Defendant was detained and patted down, and $977.00 was found in his right cargo pocket. (Docket No. 120-2 at 4; Docket No. 201-2 at 2). Pursuant to well-settled Supreme Court precedent, a full search of a person incident to a lawful arrest is a reasonable search under the Fourth Amendment. *Arizona v. Gant*, 556 U.S. 332, 338 (2009) ("Among the exceptions to the warrant requirement is a search incident to a lawful arrest. . . . [which] derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations."). "When a warrantless search is made pursuant to an arrest, '[t]he constitutional validity of the search . . . must depend upon the constitutional validity of the . . . arrest.'" *United States v. Kithcart*, 134 F.3d 529, 531 (3d Cir. 1998) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Whether a warrantless arrest is constitutionally valid "'depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it.'" *Id.* (quoting *Beck*, 379 U.S. at 91). As discussed above, Sergeant Spangler had probable cause to arrest Defendant based upon the outstanding arrest warrant. *See, e.g.*, *Zareck*, 2011 U.S. Dist. LEXIS 124056, at *33; *Barr*, 454 F. Supp. 2d at 253 n.41; *Dryden*, 567 F. Supp. 2d at 650-51. Thus, Sergeant Spangler's search of Defendant did not violate the Fourth Amendment. *See, e.g.*, *Barr*, 454 F. Supp. 2d at 252 (holding that an officer's search of the defendant's vehicle "was constitutional because it occurred incident to [his] valid arrest"); *United States v. Clemons*, No. 08-28, 2010 U.S. Dist. LEXIS 13551, at *11 (W.D. Pa. Feb. 17, 2010) ("Detective Scherf lawfully arrested Clemons based on three outstanding arrest warrants for drug trafficking and therefore, a search incident to arrest was a reasonable warrantless search under the Fourth Amendment.").

With respect to the driver, she opened the driver's side door to exit the vehicle, at which point she dropped a battery from her cell phone. (Docket No. 120-2 at 4; Docket No. 201-2 at 2; Docket No. 201-3 at 1). She was then detained. (Docket No. 120-2 at 4; Docket No. 201-2 at 2; Docket No. 201-3 at 1). Sergeant Spangler observed in plain view a backpack, located behind the driver's seat, containing a large amount of United States currency. (Docket No. 120-2 at 4; Docket No. 201-2 at 2; Docket No. 230 at 38-39, 60). Lieutenant Grooms then directed his canine, Gunner, to conduct an exterior sniff of the vehicle, starting at the driver's side rear corner and working counter clockwise around the vehicle. (Docket No. 201-3 at 1; Docket No. 230 at 87). As Gunner approached the front seam of the passenger side front door, he alerted with a head snap, increased ventilations, and a final response by sitting. (*Id.*; Docket No. 230 at 87, 91-92; *see also* Docket No. 120-2 at 4; Docket No. 201-2 at 2).

The Supreme Court has explained that "[i]t has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." *Harris v. United States*, 390 U.S. 234, 236 (1968) (per curiam). In *Coolidge v. New Hampshire*, the Court laid out a test for the application of the plain view doctrine: (1) prior justification for the government's intrusion into an otherwise protected area; and (2) the immediately apparent incriminating nature of the evidence. 403 U.S. 443, 466 (1971); *see also Horton v. California*, 496 U.S. 128, 136 (1990) (noting that "an essential predicate to any valid warrantless seizure of incriminating evidence [is] that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed," and two additional conditions are that the item must be in "plain view" and "its incriminating character must also be immediately apparent") (internal quotations omitted).

With this framework in mind, the officers observed in plain view a crack pipe on the

passenger seat where Defendant was seated and a backpack containing a large amount of United States currency. As such, the officers were able to perceive the immediately apparent incriminating nature of both items. *See, e.g.*, *United States v. Stabile*, 633 F.3d 219, 244 (3d Cir. 2011) (noting that drug paraphernalia is incriminating); *United States v. Law*, 384 F. App'x 121, 123 (3d Cir. 2010) ("The incriminating nature of a large amount of cash *may* be immediately apparent -- thus giving rise to probable cause -- where the totality of the circumstances provides some indication that the cash is contraband.") (emphasis in original). Here, the totality of the circumstances, as previously outlined, establishes that the large amount of United States currency in the backpack was incriminating. *See Law*, 384 F. App'x at 122-23 ("[A]lthough a wad of cash is not in itself a suspicious object, a wad of cash in the hands of a person who the police have good reason to believe just received it in exchange for a delivery of illegal drugs is suspicious and indeed enough so to give the police probable cause to believe it evidence of criminal activity.") (internal quotations omitted).

Moving on, the Supreme Court has consistently held that an exterior canine sniff of a car during a lawful traffic stop does not amount to a "search" under the Fourth Amendment. *Illinois v. Caballes*, 543 U.S. 405, 410 (2005) ("A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment."); *Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000) ("[A] sniff by a dog that simply walks around a car is much less intrusive than a typical search.") (internal quotations omitted). The Third Circuit has followed suit. *See, e.g.*, *United States v. Pierce*, 622 F.3d 209, 212-13 (3d Cir. 2010) (holding that a canine search was not a search within the meaning of the Fourth Amendment); *United States v. Burton*, 288 F.3d 91, 100 n.6 (3d Cir. 2002) ("In these circumstances, walking a dog around the outside of the vehicle is not a

search.") (citing *City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000) ("The fact that officers walk a narcotics-detection dog around the exterior of each car . . . does not transform the [initial] seizure [of the car] into a search."); *United States v. Place*, 462 U.S. 696, 707 (1983) (canine sniff not a search)). Thus, the Fourth Amendment was not implicated when Lieutenant Grooms directed his canine to conduct an exterior sniff of the vehicle.

Following the canine sniff, Magisterial District Judge Haggerty granted Sergeant Spangler a search warrant for the vehicle. (Docket No. 120-2 at 1, 4; Docket No. 201-2; Docket No. 201-3 at 1). In the application, Sergeant Spangler sought permission to search a "[w]hite Chevy sedan bearing PA registration #KCZ7133, VIN-ZG1WF55E739212925, currently located in the Butler Bureau Fire Department. And any and all belongings inside the vehicle." (Docket No. 201-2 at 1). After searching the vehicle, Sergeants Spangler and Grooms recovered: (1) a crack pipe on the passenger seat and $1.00; (2) a backpack containing 509 bags of heroin stamped "Ferrari," four bags of crack cocaine totaling 56.9 grams, $6,280.00 in United States currency, and a wallet with identification belonging to Scott Bowra; and (3) four cell phones. (Docket No. 120-2 at 4; *see also* Docket No. 201-2 at 5; Docket No. 201-3 at 1). Defendant has not challenged the issuance of the warrant. (*See* Docket Nos. 120, 121, 200, 201, 210).

To conclude, after careful consideration of the evidence of record, the Court finds that the Government has established by a preponderance of the evidence that the law enforcement activities leading up to Defendant's arrest were justified under the relevant Fourth Amendment principles discussed above. *See Cortez*, 449 U.S. at 417. Accordingly, Defendant's motion to suppress as to the warrantless stop will be denied.

### B. Vehicle Search

In the alternative, Defendant argues that the evidence obtained from the search warrant

resulted from his illegal seizure.  (Docket No. 201).  In response, the Government contends that Defendant lacks standing to challenge the search of the vehicle because he was a passenger. (Docket No. 208).  In his reply, Defendant, relying upon law from the Second Circuit and the Southern District of Alabama, asserts that he had a legitimate and reasonable expectation of privacy in the backpack.  (Docket No. 210 at 2 (citing *United States v. Sparks*, 287 F. App'x 918, 920 (2nd Cir. 2008); *United States v. Rodriguez*, No. 11-CR-122, 2011 U.S. Dist. LEXIS 89043 (S.D. Ala. Aug. 10, 2011)).

As an initial matter, it is well settled that "'a passenger in a car that he neither owns nor leases typically has no standing to challenge a search of the car.'"  *United States v. Burnett*, 773 F.3d 122, 131 (3d Cir. 2014) (quoting *United States v. Baker*, 221 F.3d 438, 441-42 (3d Cir. 2000)). The Third Circuit has explained that passengers lack standing because "[p]assengers in cars, unlike owners or licensees, have no reasonable expectation of privacy in the interior of the vehicle in which they are riding."  *United States v. Mosley*, 454 F.3d 249, 252-53 (3d Cir. 2006).  With respect to whether a passenger retains a reasonable expectation of privacy in materials located within the vehicle, the Third Circuit has stated that "passengers in an illegally stopped vehicle have 'standing' to object to the stop, and may seek to suppress the evidentiary fruits of that illegal seizure under the fruit of the poisonous tree doctrine."  *Id.* at 253; *see also Burnett*, 773 F.3d at 127 (noting that "even though the owner of a vehicle may claim a privacy interest in the vehicle and its contents, a passenger or former passenger of the vehicle faces an uphill battle if he attempts to establish that he has standing to move to suppress evidence found in the vehicle during the search"); *United States v. Brown*, No. 15-CR-182, 2017 U.S. Dist. LEXIS 132848, at *39-40 (W.D. Pa. Aug. 21, 2017) ("As a passenger in the vehicle, Defendant had no reasonable expectation of privacy in the vehicle and thus lacks standing to object to evidence discovered in a

search of it.").[10]

Here, for the reasons outlined above, the Court has concluded that Defendant was not illegally seized. *See Mosley*, 454 F.3d at 253 (stating that passengers "may seek to suppress the evidentiary fruits of [an] *illegal* seizure") (emphasis added). Further, the evidence presented does not establish that Defendant had a reasonable expectation of privacy in the vehicle. While Defendant's identification was found in the backpack and he testified that it was his, Sergeant Spangler confirmed that Defendant did not indicate that the backpack belonged to him on the scene. (Docket No. 230 at 69). Moreover, the warrant issued to Sergeant Spangler authorized him to search a "[w]hite Chevy sedan bearing PA registration #KCZ7133, VIN-ZG1WF55E739212925, currently located in the Butler Bureau Fire Department. *And any and all belongings inside the vehicle*." (Docket No. 201-2 at 1 (emphasis added)). Accordingly, the Court cannot conclude that Defendant's Fourth Amendment rights were violated by the search of the backpack contained in the vehicle, which was expressly authorized by the warrant.

IV.    CONCLUSION

Based on the foregoing, Defendant's Motion to Suppress, (Docket No. 120), is DENIED. An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
U.S. District Judge

cc/ecf: All counsel of record

---

[10] In *United States v. Byrd*, the Third Circuit held that an unauthorized driver of a rental vehicle does not have standing to challenge a search of a vehicle. *United States v. Byrd*, 679 F. App'x 146 (3d Cir. 2017). The United States Supreme Court granted certiorari on the case in September 2017. *Byrd v. United States*, 138 S. Ct. 54 (Sept. 28, 2017). Because Defendant was not the driver, the vehicle was not a rental, and a search warrant authorized the search of the vehicle and the backpack, *Byrd* is inapplicable to this matter. Indeed, the Third Circuit has noted the distinction between cases arising under the instant facts and *Byrd*, stating that "[a]lthough there is a circuit split on whether, in exceptional circumstances, an unauthorized driver can have a reasonable expectation of privacy, no court of appeals has recognized the expectation of privacy for a passenger in a rental car." *United States v. Kennedy*, No. 15-4009, 2017 U.S. App. LEXIS 25473, at *15 (3d Cir. Dec. 18, 2017).